start with 242045, Wickham v. Commissioner of Social Security. Thank you. Good morning, Your Honors, and may it please the Court. My name is Christopher Boas. I represent the talent Lucas Wickham. Mr. Wickham experienced an onset of paranoid schizophrenia in 2018 at a very young age. The symptoms were dramatic. First, he complained of problems with stress and with his stomach, and it was only later on that he confided with his pediatrician that he's been hearing voices and seeing people. He repeatedly sees people with a mask over their face. He sees people with knives. He sees people with guns, and he lives in terror that someone is going to come and kill him. This isn't limited to just an abstract stranger. He wonders whether or not family members might also be trying to kill him. This is the nature of his paranoid delusion, which is well documented in the record, specifically with the treatment notes with nurse practitioner, psychiatric nurse practitioner, Amanda Hance, who provided an opinion which, if accepted, would support Mr. Wickham's claim for disability. We believe the administrative law judge failed in her duty to address nurse practitioner Hance's opinion. The new rules provide that while a treating source's opinion may... I probably will. The new rules regarding... For claims filed after March of 2017, the treating physician rule no longer applies. However, the guts of the treating physician rule, in my opinion, survives, which is we look to the supportability of the opinion, and we look to the consistency in the remainder of the record. Am I right when you say the guts survive? I mean, the notion that there's a finger on the scale or a sort of presumption for the treating physician's opinion, if it's well supported, that hasn't survived, has it? No. No. So the idea that a treating physician's opinion could control the evidentiary outcome has been completely removed. Instead, the focus is now on the supportability and the consistency of the opinion with the remainder of the record, which was always the substantial analysis that the court engaged in under the treating physician rule. Importantly, under... We still have the rule that the agitator must explain the reasons for their... The decision, the persuasiveness that they assign to a particular opinion. And this court ruled in a case called Laux that it's inappropriate for the fact finder to ignore the stated reasons in the source's opinion. And here, that happened. The ALJ says that nurse practitioner Hans stated that her opinion was supported by cognitive impairment, attention difficulties, and I forget the third thing. But in our brief, what she ignored was the fact that NP Hans said, Mr. Wickham has two problems with paranoid schizophrenia. There's the positive symptoms of schizophrenia. These are the delusions where he's calling his mother every other night saying, I think there's an intruder. His parents have to go over to his room and assure him that there's not. He's afraid people are out to get him. He's afraid to go outside because he's going to have a panic attack. These are the positive symptoms of schizophrenia. The negative symptoms of schizophrenia are just as real and just as debilitating. This is a lack of motivation, excessive sleeping, a lack of interest in the things that you used to do. Before the onset of schizophrenia, Mr. Wickham had friends. He used to go out and go trap shooting. He was engaged in school. He no longer is. He withdrew and he was trying to be homeschooled. He tried to attend an alternative school, but he couldn't even attend that two to three days a week. It was a struggle for him. The judge's failure to address NP Hans' opinion on its own terms is reversible error. Well, didn't he find that some of her findings were inconsistent with those of Dr. Noya and Dr. Teese's in terms of things like normal memory, attention, cognitive functioning? Dr. Noya saw Mr. Wickham one day in November of 2019. And this court has also held that we shouldn't rely on the one-time opinion of the doctor. And here the ALJ clearly did that. If we look at the step three findings by this ALJ, she just follows whatever Dr. Noya said with respect to the four areas of functioning under the listings. Dr. Teese was an alternative doctor that Mr. Wickham saw. He actually saw him initially at the suggestion of his pediatrician. Mr. Wickham then saw nurse practitioner Hans. Unfortunately, all of this happens during the COVID. So in the spring of 2020, Mr. Wickham is seeing Dr. Teese by telephone. Dr. Teese isn't examining. He's not looking into his eyes. It's not looking into his demeanor. It's all by phone. That's a limitation I think that the court should consider in this case in terms of what Dr. Teese was able to figure out. By contrast, with NP Hans, there was an ongoing relationship. The mobile integration team was sent to his house to try to draw him out of his shell. And the description by the social worker Boucher is illuminating. He just kept to himself. He didn't socialize with anyone else. Were some of her own conclusions inconsistent with some of her own progress notes? No. There's no inconsistency with her own progress notes. We believe it's well supported. It doesn't have to be perfectly supported. There has to be some reasonable support in the record for her opinion. It doesn't have to be perfectly supported. But when we're reviewing the ALJ's conclusion, it's got to be a lot more than, oh yes, there would have been support for this conclusion. It has to be so incontrovertible that there's not substantial evidence for the contrary conclusion. One of the things I'm grappling with with NP Hans is there are these four factors under paragraph B, and you've got to get to market on two of them. That's sort of where we're getting into the weeds. She says moderate to market limitations cognitively. No other examining provider suggested that there was anything more than slight impairment. And the testing that happened in 2019 through the school suggested he's right there in the average level. And so I'm wondering how you overcome that as something that arguably undermines NP Hans' credibility sort of more broadly in terms of how she's assessing this. The listings at part B of the listings that go to severity, NP Hans says that Mr. Wakeham would have marked problems with complex instructions and moderate problems with simple instructions. That part of the listing doesn't look only to simple instructions. It's looking at the entirety of your ability to function to support a marked finding in that area. I think Dr. Thies also found I don't think he found slight limitations in that area. Well, I'm just speaking. But our point is if you look to the psychological testing that preceded the onset of his schizophrenia, and I think that's pretty clear what happened here. Prior to 2018, he was functioning well. He was doing okay in school. He participated in school, and then he completely withdraws, and he starts to complain to his pediatrician that I can't get it. I don't understand these things anymore. And that's what Dr. Hans is referring to is the interference in his thinking because he's distracted by all of these things going on in his head, some of which he says, sometimes I don't know what's real and what's the hallucination. And he's struggling with this on an ongoing basis, and I think the record is fairly clear that this is not isolated and it persists despite treatment with psychiatric medications. We're going to get to hear from you again in rebuttal, so maybe we'll hear from the Commissioner. Thank you, Your Honors. Candice Brown Casey for the Commissioner. May it please the Court. The Court should affirm the Commissioner's decision that Mr. Wickham was not disabled. The issue here is not simply whether Mr. Wickham had any psychiatric impairments or symptoms. Rather, the issue is to what extent his impairments resulted in functional limitations relevant to the ability to work. Here, the ALJ reasonably considered all relevant evidence, acknowledged evidence both in favor of Mr. Wickham's contentions and that detracted from Mr. Wickham's contentions, and reasonably resolved conflicts in the record. Under the deferential standard of review, this Court should affirm the ALJ's findings. One of the things I struggle with in cases like this is we have these sort of charts and metrics, but at the end of the day, what we're getting at is what's somebody's functional capability? What can they do in the workforce? And N.P. Hance's views, while perhaps not situated sort of squarely in the center of the range of views, seem to be most tied to what's actually happening in this boy's life, what he's actually able to do. And we see that he's basically locked in his house all day most days, having a history of not being that way. How do we grapple with that when we're trying to figure out whether the ALJ improperly undervalued N.P. Hance's views about his limitations? Your Honor, the ALJ reasonably accounted for those limitations in the record and those subjective complaints and those reports of Mr. Wickham's daily activities. Although the ALJ did not find N.P. Hance's opinion to be persuasive, as the ALJ did the prior administrative medical findings, the ALJ still assessed a very limited RFC that did account for portions of N.P. Hance's medical opinion, even if it wasn't found persuasive, including finding that Mr. Wickham could only perform simple tasks, follow simple instructions and directions, with occasional decision-making, and limited interaction with others, including no contact with the public. But the ALJ properly reviewed the entire record before her. Here, the relevant period is from September 13, 2019, when Mr. Wickham applied for supplemental security income through the ALJ's decision of May 27, 2021. Ms. Hance treated Mr. Wickham from about July 2019 to about March 2020, so it's a limited portion of the overall 20-month relevant period. Ms. Hance also did not review all of Mr. Wickham's other treatment records, as the ALJ did. And in July 2020, two expert psychologists of the state agency reviewed a significant portion of the record, one at the reconsideration level of administrative review, and then an additional quality review, which is not frequently the case in these matters. And the records they reviewed span from late 2018 to June 2020. They included Nurse Hance's records and her March 2020 medical opinion. They also included records from other providers, including the consultative examination, medical records from Dr. Fessy, and records from the mobile integration unit. And the quality review expert psychologist, Dr. Gonzalez, based on the evidence before him, indicated that Mr. Wickham had a good response to treatment, overall good symptom control, even though he had occasional symptom exacerbations due to stressors. So when they're reviewing the records, right, so one thing they're reviewing, I suppose, is his subjective complaints as reported, and they're reviewing the sort of objective findings from the other providers. It was striking to me that every evaluator, clinician who saw this young man in person, and when I say in person, I realize that may also mean in person through a screen, identified him as having marked limitations in the social functioning. The state examiners who never interfaced with him in any way and only reviewed a paper record are the only ones who identified the social limitations as being less than marked. And I guess I'm wondering whether when we're talking about social limitations, whether the actual interaction would be a really important part of that assessment such that it would be problematic to rely on somebody's review of the papers in contrast to the opinions of all the people who saw him. I wonder what your thought is about that. The evidence the examining experts, psychologists, had before them included mental status findings such as appropriate and cooperative behavior. Mr. Wickham was able to interact with his providers and the consultative examiner who, of course, he did not know before that examination. The expert psychologist and ALJ also reviewed evidence that indicated, although Mr. Wickham had some difficulties with the general public in going out, he had relationships with his friends. He did go to public places such as went bowling with friends, out to dinner, attended a birthday party. That's a great example because I think we're always a little skeptical about people's subjective reports when we think they're exaggerating their limitations. But I wonder whether the same skepticism might apply in the other direction. So you have a situation where there's a record from the people who took him bowling as part of this group. And they say, yeah, he came and he kept his headphones on the whole time and he didn't interact with anybody the whole time. He took off his headphones to bowl, put them back on, and didn't talk to anybody. And then the next day he reports to his clinician, oh, yeah, we're bowling with friends last night. Right? So if you're grabbing onto that subjective report of bowling with friends without looking at the objective report of what that really looked like, is that a problem? It's not a problem, Your Honor, because it's the ALJ's job to resolve conflicts. And the ALJ reasonably did so here. The record also includes other reports of spending time with friends, including during those unusual pandemic days in 2020. Mr. Wickham still reported that he would spend time with friends online or in person, playing video games, playing poker. There are indications in the record that he... Supposing he could do none of the above? Supposing he couldn't do social interaction? Would that be determined? The RFC does account for significant limitations in social functioning, including that the ALJ found that he could not interact at all with the public. And then also that he had to have limited interaction with his work colleagues in terms of the types of interaction he could do to perform simple work. The ALJ found that he should not have particularly complex social interactions in the workplace with his colleagues. Supposing he was one of the possibilities, working in a linen, folding linen or something like that. My question is whether that... Is the social interaction by somebody walking in and saying, here's today's linen and walking out. Is that enough to matter? Or does social interaction have to be more than what matters? Based on the vocational expert's testimony in response to the ALJ's hypothetical that matched this RFC determination, the types of interactions as well as the jobs cited by the vocational expert that were adopted as part of the Step 5 finding were representative occupations that an individual such as Mr. Wickham could perform. And greater social limitations were not required or the finding of greater social limitations was not directed by this record. Again, the ALJ... There are some conflicts in this record as there are in many of the records before ALJs. And the ALJ here reasonably acknowledged evidence that could go in favor of Mr. Wickham or cut against his reports of disability. And because the deferential standard of review requires the court to affirm the commissioner's decision, even if the record could support a different finding, because of that deferential standard of review, we ask that the court affirm. And if you have no other questions, I'll rest my papers. Thank you. Appreciate your arguments. Attorney Bowes. Your Honors, I appreciate the focus on the description and the record where Mr. Wickham went bowling. This was with the mobile integration team. He was drawn out of his home where he preferred to stay because the interaction with other people was something that would make him fearful and panic. His mother testified that she was aware of his problems. Again, he's calling her or his father every other night saying that he thinks he hears something. The judge's decision does not account for the persistence of his complaints of auditory and visual hallucinations. This is like hearing a growling voice in the yard. I mean, it's interesting to think about the hallucinations and how they, because the social security is focused on what functional capacity somebody has. And you might have horrible auditory hallucinations that make you very fearful and impact your life, but don't necessarily prevent you from doing gainful employment, right? So those are, you have to, it seems like given your argument, which focused on the meets or equals the listing step of the analysis, you have to be able to plug those auditory hallucinations into these boxes. Even if we give you, let's say we concluded that there isn't substantial evidence to support the ALJ's conclusion that N.P. Hans was wrong as to the level of impairment on the social functioning axis, right? That there is in fact market, it's undeniable that he has market limitations there. You still need to be able to show that there's one other of those four variables on which essentially no reasonable ALJ could have concluded anything other than that there were market limitations. Yes and no. With respect to step three, yes, we need two market limitations. And the other market limitation is in his ability to function and complete his schoolwork, which he can't persist on an ongoing basis in completing the schoolwork. The schoolwork is repeated, the bars are repeatedly lowered for him so that he could pass a modified, they're not going to give him a complete diploma, but they'll say you've completed high school. And he can't, he's struggling to do that. We see that that goes to understanding, applying and using information as much as it does to concentration, persistence and pace. And that evidence, you know, for what's actually happened supports a market limitation in those two other domains as well. At step five of the sequential evaluation, or with respect to the residual functional capacity, if we accept N.P. Hans' description of his inability to leave the house, that would be preclusive of all work under Social Security Ruling 85-15, which we described in our brief. Under Social Security Ruling 85-15, a substantial loss of the ability to interact, relate to coworkers, supervisors and or the public can support a finding of disability because all jobs require some ability to interact and relate to other people. And the record shows for the period of time covered by this record Mr. Wickham was unable to do that because he has these ongoing fears that someone is going to try to kill him, including family members. That would make any social interaction for him impossible. Excuse me, Your Honor? That would make any social interaction by him with someone else impossible and therefore he could not do any jobs. I would frame it the way the Commissioner does, which is on an ongoing basis. You have to be able to do eight hours a day, five days a week, weekend, week out, without a significant interference from these symptoms. So if this were happening just once a week where he's saying, like with school, I can't make it to school because I'm too fearful, that would be preclusive of work for those days in which he's experiencing these fearful symptoms, which he can't control. He's definitely taking the medication as prescribed. They're adjusting it when it's not working or creating too much sedation. He's working with his providers. He wants to make these symptoms go away. He tries to see other doctors. He says, it's not working. I want to try something else. He is engaged in his treatment. Despite that, he continues to have the hallucinations. Thank you. We appreciate you. We'll take it under advisement and get something out to you. Thank you both.